**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KHAMARI BABB, on behalf of himself and all others similarly situated, | No. 1:25-cv-6745 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | DEMAND FOR JURY TRIAL |
| TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, | |
| Defendant. | |

### CLASS ACTION COMPLAINT

Plaintiff Khamari Babb ("Plaintiff"), individually and on behalf of all similarly situated persons, and on behalf of the general public, brings this Class Action Complaint, against defendant Trustees of Columbia University in the City of New York ("Columbia" or "Defendant") based upon knowledge and the investigation of counsel, and alleges:

## I.   INTRODUCTION

1.      Plaintiff brings this class action against Defendant for its failure to properly secure and safeguard sensitive information of its student and student-applicants.

2.      Defendant is a private university based in New York, New York.

3.      As part of its business, and in order to gain profits, Defendant obtained and stored the personal information of its students, applicants, and faculty, including the personal information of Plaintiff and Class members.

4.      By taking possession and control of Plaintiff's and Class members' personal information, Defendant assumed a duty to securely store and protect it.

5.      Defendant breached this duty and betrayed the trust of Plaintiff and Class members by failing to properly safeguard and protect their personal information, thus enabling

1

cybercriminals to access, acquire, appropriate, compromise, disclose, encumber, exfiltrate, release, steal, misuse, and/or view it.

6.    On or May 16, 2025, Columbia University experienced a data breach, wherein unauthorized cybercriminals infiltrated Defendant's inadequately secured computer network and stole files containing the sensitive personal information of approximately 868,969 individuals (the "Data Breach").[1]

7.    Plaintiff's and Class Members' sensitive personal information—which they entrusted to Defendant on the mutual understanding that Defendant would protect it against disclosure—was targeted, compromised and unlawfully accessed due to the Data Breach (defined below).

8.    Defendant collected and maintained certain personally identifiable information of Plaintiff and the putative Class Members (defined below), who are (or were) students or student-applicants at Defendant.

9.    According to Columbia University, the personal information accessed by cybercriminals involved a wide variety of personally identifiable information ("PII"), including but not limited to names, dates of birth, Social Security numbers, contact information, financial account information, health insurance information, and demographic information (collectively, "PI" or "Personal Information").[2]

10.    As a result of the Data Breach, Plaintiff and Class Members suffered concrete injuries in fact including, but not limited to: (i) invasion of privacy; (ii) theft of their PI; (iii) lost or diminished value of PI; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to their PI,

---

[1] https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792- a1252b4f8318/5cd48662-983a-4c9d-8b5b-e5e097cbbcd5.html (last accessed August 12, 2025).

[2] *Id.*

which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PI.

11.    The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect consumers' PI from a foreseeable and preventable cyber-attack.

12.    Moreover, upon information and belief, Defendant was targeted for a cyber-attack due to its status as an educational institutions company that collects and maintains highly valuable PI on its systems.

13.    Defendant maintained, used, and shared the PI in a reckless manner. In particular, the PI was used and transmitted by Defendant in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' PI was a known risk to Defendant, and thus, Defendant was on notice that failing to take steps necessary to secure the PI from those risks left that property in a dangerous condition.

14.    Defendant disregarded the rights of Plaintiff and Class Members by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

15.    Plaintiff's and Class Members' identities are now at risk because of Defendant's negligent conduct because the PI that Defendant collected and maintained has been accessed and acquired by data thieves.

///

///

///

16.     As a result of the Data Breach and the release of financial aid information, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must know and in the future closely monitor their financial accounts to guard against identity theft.

17.     Plaintiff and Class Members may also incur out-of-pocket costs, *e.g.*, for purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

18.     Plaintiff brings this class action lawsuit on behalf of all those similarly situated to address Defendant's inadequate safeguarding of Class Members' PI that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and other Class Members that their information had been subject to the unauthorized access by an unknown third party and precisely what specific type of information was accessed.

19.     Through this Complaint, Plaintiff seeks to remedy these harms on behalf of himself and all similarly situated individuals whose PI was accessed during the Data Breach.

20.     Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

## II.     PARTIES

21.     Plaintiff Khamari Babb is, and at all times mentioned herein, a citizen of the State of Maryland.

22.     Defendant Trustees of Columbia University in the City of New York is a private educational institution with its principal place of business at 211 Low Library, MC 4324, 535 West 116th Street, New York, NY 10027.

## III.     JURISDICTION AND VENUE

23.     The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many

of whom have different citizenship from Columbia. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

24.    This Court has jurisdiction over Columbia because Columbia operates in and/or is incorporated in this District.

## IV.    FACTUAL ALLEGATIONS

### A.  Defendant's Business.

25.    Defendant is a private university based in New York, New York.

26.    Plaintiff and Class Members are current and former students and student-applicants at Defendant.

27.    In the course of their relationship, students and student-applicants, including Plaintiff and Class Members, provided Defendant with their sensitive PI.

28.    Upon information and belief, in the course of collecting PI from students and student-applicants, including Plaintiff, Defendant promised to provide confidentiality and adequate security for the data it collected from them through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

29.    Indeed, Defendant notes on its website that "privacy is important to us."[3]

30.    Plaintiff and the Class Members, as students or student-applicants at Defendant, relied on these promises and on this sophisticated business entity to keep their sensitive PI confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Consumers, in general, demand security to safeguard their PI.

### B.  The Data Breach.

31.    On or around June 24, 2025, Columbia University became aware of suspicious activity on its computer systems, indicating a data breach. Based on a subsequent forensic investigation, Columbia determined that cybercriminals infiltrated its inadequately secured

---

[3] https://www.college.columbia.edu/privacy

computer network on or around May 16, 2025. The investigation further determined that, through this infiltration, cybercriminals accessed and copied files containing the sensitive personal information of approximately 868,969 individuals.[4]

32.     The Personal Information accessed and stolen by cybercriminals included, but is not limited to, names, dates of birth, Social Security numbers, contact information, financial account information, health insurance information, and demographic information.

33.     Despite the breadth and sensitivity of the PI that was exposed, and the attendant consequences to affected individuals as a result of the exposure, Defendant failed to disclose the Data Breach for several months from the time of the Breach. This inexplicable delay further exacerbated the harms to Plaintiff and Class members.

34.     Based on the notice letter received by Plaintiff, the type of cyberattack involved, and public news reports, it is plausible and likely that Plaintiff's Personal Information was stolen in the Data Breach.

35.     Upon information and belief, the unauthorized third-party cybercriminal gained access to the PI, exfiltrated the PI from Defendant's network, and has engaged in (and will continue to engage in) misuse of the PI, including marketing and selling Plaintiff's and Class members' PI on the dark web.

36.     Defendant had obligations created by the FTC Act, contract, common law, and industry standards to keep Plaintiff's and Class Members' PI confidential and to protect it from unauthorized access and disclosure.

37.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of PI, such as encrypting the information or deleting it when it is no longer needed.

///

---

[4] *See* https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792- a1252b4f8318/5cd48662-983a-4c9d-8b5b-e5e097cbbcd5.html.

38.     Upon information and belief, the attacker accessed and acquired files containing unencrypted PI of Plaintiff and Class Members. Plaintiff's and Class Members' PI was accessed and stolen in the Data Breach.

39.     Plaintiff further believes that his PI and that of Class Members was or will be subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

### C. Plaintiff Babb's Experience.

40.     Plaintiff applied for admission to Columbia for the 2025 academic year but did not enroll.

41.     Upon information and belief, Defendant obtained Plaintiff Babb's PI in the course of processing Plaintiff's application for college admission.

42.     Upon information and belief, at the time of the Data Breach, Defendant maintained Plaintiff's PI in its system.

43.     Plaintiff received a notice letter from Defendant dated August 7, 2025, informing him that his PI—including his Social Security Number—was specifically identified as having been exposed to cybercriminals in the Data Breach.[5]

44.     Because of the Data Breach, Plaintiff's PI is now in the hands of cyber criminals. Plaintiff and all Class members are now imminently at risk of crippling future identity theft and fraud.

45.     Plaintiff is very careful about sharing his sensitive PI. Plaintiff stores any documents containing his PI in a safe and secure location. Plaintiff has never knowingly transmitted unencrypted sensitive PI over the internet or any other unsecured source. Plaintiff would not have entrusted his PI to Defendant had he known of Defendant's lax data security policies.

///

---

[5] Exhibit 1 – Plaintiff's Data Breach Notice Letter

46.    As a result of the Data Breach, Plaintiff experienced a significant increase in spam calls and emails, which, upon information and belief, was caused by the Data Breach. This misuse of his PI was caused, upon information and belief, by the fact that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

47.    Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, consulting attorneys, monitoring financial accounts, and reviewing credit scores/history.

48.    Plaintiff has spent several hours dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

49.    Plaintiff suffered actual injury from having his PI compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of his PI; (iii) lost or diminished value of PI; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to his PI, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PI.

50.    The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed Plaintiff of key details about the Data Breach's occurrence.

51.     As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

52.     As a result of the Data Breach, Plaintiff Turner is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

53.     Plaintiff has a continuing interest in ensuring that his PI, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### D.  The Data Breach was a Foreseeable Risk and Defendant was on Notice.

54.     It is well known that PI is a valuable commodity and a frequent, intentional target of cyber criminals. Companies that collect such information, including Defendant, are well-aware of the risk of being targeted by cybercriminals.

55.     Individuals place a high value on the privacy of their PI. Identity theft causes severe negative consequences to its victims, as well as severe distress and hours of lost time trying to fight against the impact of identity theft.

56.     A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice, "[a] direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss."[6]

57.     Additionally in 2021, there was a 15.1% increase in cyberattacks and data breaches from 2020. Over the next two years, in a poll of security executives, they have predicted an increase

---

[6] "Victims of Identity Theft, 2018," U.S. Department of Justice (April 2021, NCJ 256085) available at: https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last visited August 12, 2025).

in attacks from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable cases will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[7]

58. Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, and hopefully can ward off a cyberattack.

59. According to an FBI publication, "[r]ansomware is a type of malicious software, or malware, that prevents you from accessing your computer files, systems, or networks and demands you pay a ransom for their return. Ransomware attacks can cause costly disruptions to operations and the loss of critical information and data."[8] This publication also explains that "[t]he FBI does not support paying a ransom in response to a ransomware attack. Paying a ransom doesn't guarantee you or your organization will get any data back. It also encourages perpetrators to target more victims and offers an incentive for others to get involved in this type of illegal activity."[9]

60. Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite its own acknowledgment of its duties to keep PI private and secure, Defendant failed to take appropriate steps to protect Plaintiff's and the proposed Class's PI of from being compromised.

### E. Data Breaches are Preventable.

61. Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of PI, such as encrypting the information or deleting it when it is no longer needed.

62. Defendant could have prevented this Data Breach by, among other things, properly

---

[7] https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864 (last visited August 12, 2025).

[8] https://www.fbi.gov/how-we-can-help-you/safety-resources/scams-and-safety/common-scams-and-crimes/ransomware (last visited August 12, 2025).

[9] *Id.*

encrypting or otherwise protecting their equipment and computer files containing PI.

63.    To prevent and detect cyber-attacks and/or ransomware attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

a.  Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

b.  Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

c.  Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

d.  Configure firewalls to block access to known malicious IP addresses.

e.  Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

f.  Set anti-virus and anti-malware programs to conduct regular scans automatically.

g.  Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

h.  Configure access controls—including file, directory, and network share permissions— with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

i.  Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

j.  Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

k.  Consider disabling Remote Desktop protocol (RDP) if it is not being used.

l.  Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

m.  Execute operating system environments or specific programs in a virtualized environment.

n.  Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units. [10]

64.  To prevent and detect cyber-attacks or ransomware attacks, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

Secure internet-facing assets

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

Thoroughly investigate and remediate alerts

- Prioritize and treat commodity malware infections as potential full compromise;

Include IT Pros in security discussions

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

Build credential hygiene

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

Apply principle of least-privilege

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

Harden infrastructure

- Use Windows Defender Firewall
- Enable tamper protection

---

[10] How to Protect Your Networks from RANSOMWARE, at 3-4, *available at:* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited August 12, 2025).

-     Enable cloud-delivered protection[11]
-     Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].

65. Given that Defendant was storing the PI of its current and former students and student-applicants, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

66. The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and data thieves acquiring and accessing the PI of, upon information and belief, more than three million individuals, including that of Plaintiff and Class Members.

### F. Defendant Failed to Comply with FTC Guidelines.

67. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

68. In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[12] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from

---

[11] *See* Human-Operated Ransomware Attacks: A Preventable Disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a- preventable-disaster/ (last visited on August 12, 2025).

[12] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited August 12, 2025).

the system; and have a response plan ready in the event of a breach.[13]

69.    The FTC further recommends that companies not maintain PI longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

70.    Defendant failed to properly implement basic data security practices.

71.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to customers and/or employees of Defendant's applicants' PI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

72.    Defendant was at all times fully aware of its obligation to protect the PI of its applicants. Defendant was also aware of the significant repercussions that would result from its failure to do so.

### G. Defendant Failed to Comply with Industry Standards

73.    As shown above, experts studying cyber security routinely identify educational institutions as being particularly vulnerable to cyberattacks because of the value of the PI which they collect and maintain.

74.    Several best practices have been identified that a minimum should be implemented by data collectors like Defendant, including but not limited to: educating all employees; utilizing strong passwords; creating multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; using multi-factor authentication; protecting backup data, and; limiting which employees can access sensitive data.

75.    Other best cybersecurity practices that are standard in this industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as

---

[13] *Id.*

firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

76.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

77.    Defendant failed to comply with the accepted standards and existing frameworks, thereby opening the door to and failing to thwart the Data Breach.

### H.  Common Injuries and Damages.

78.    As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PI ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (i) invasion of privacy; (ii) theft of their PI; (iii) lost or diminished value of PI; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to their PI, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PI.

### I.  Data Breaches Increase Victims' Risk of Identity Theft

79.    The unencrypted PI of Class Members will end up for sale on the dark web as that is the *modus operandi* of hackers.

///

80.     Unencrypted PI may also fall into the hands of companies that will use the detailed PI for targeted marketing without the approval of Plaintiff and Class Members. Simply put, unauthorized individuals can easily access the PI of Plaintiff and Class Members.

81.     The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PI to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

82.     Plaintiff's and Class Members' PI is of great value to hackers and cybercriminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiff and Class Members and to profit off their misfortune.

83.     One such example of criminals piecing together bits and pieces of compromised PI for profit is the development of "Fullz" packages.[14]

84.     With "Fullz" packages, cybercriminals can cross-reference two sources of PI to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

85.     The development of "Fullz" packages means here that the stolen PI from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PI that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it

---

[14] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), *available at* https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas- life-insurance-

at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

86.    The existence and prevalence of "Fullz" packages means that the PI stolen from the data breach can easily be linked to the unregulated data (like contact information) of Plaintiff and the other Class Members.

87.    Thus, even if certain information (such as contact information) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

88.    Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

### J.  Loss of Time to Mitigate Risk of Identity Theft and Fraud.

89.    As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their PI was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

90.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach. Accordingly, the Data Breach has caused Plaintiff and Class Members to suffer actual injury in the form of lost time—which cannot be recaptured—spent on mitigation activities.

91.    Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[15]

---

[15] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf (last visited on August 12, 2025).

92.    Plaintiff's mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[16]

### K.  The Value of Personal Information.

93.    PI is a valuable property right. Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts including heavy prison sentences. Even this obvious risk-to-reward analysis illustrates beyond doubt that PI has considerable market value.[17]

94.    Sensitive PI can sell for as much as $363 per record according to the Infosec Institute.[18]

95.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[19][20]

96.    Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[21]

///

---

[16] *See* Federal Trade Commission, *Identity Theft.gov*, https://*www.identitytheft.gov/Steps*

[17] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://*www.gao.gov/new.items/d07737.pdf* ("GAO Report") (last visited on August 12, 2025).

[18] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[19] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited on August 12, 2025).

[20] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited on August 12, 2025).

[21] https://digi.me/what-is-digime/ (last visited on August 12, 2025).

97.     As a result of the Data Breach, Plaintiff's and Class Members' PI, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PI is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

98.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PI of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

99.     The fraudulent activity resulting from the Data Breach may not come to light for years.

100.    Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PI.

101.    Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to, upon information and belief, more than eight hundred thousand individuals' detailed personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

102.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PI of Plaintiff and Class Members.

## L.  *Loss of Benefit of the Bargain*

103.    Furthermore, Defendant's poor data security practices deprived Plaintiff and Class Members of the benefit of their bargain. When applying for enrollment at Defendant under certain terms, Plaintiff and other reasonable consumers understood and expected that they were, in part,

paying for the enrollment services and necessary data security to protect the PI, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received enrollment services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

## V.     CLASS ACTION ALLEGATIONS

104.    Plaintiff brings this class action on behalf of himself and all other similarly situated individuals under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), and on behalf of the Class:

**Class**

All persons in the United States who were impacted by the Data Breach discovered by Defendant in June 2025, including all those who received notice of the data breach.

105.    Excluded from the Class are governmental entities, Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, affiliates, legal representatives, employees, coconspirators, successors, subsidiaries, and assigns. Also excluded from the Class are any judges, justices, or judicial officers presiding over this matter and the members of their immediate families and judicial staff.

106.    This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements therein.

107.    **Numerosity**. The proposed Class is believed to be so numerous that joinder of all members is impracticable. The proposed Subclass is also believed to be so numerous that joinder of all members would be impractical.

108.    **Commonality**. Common legal and factual questions exist that predominate over any questions affecting only individual Class Members. These common questions, which do not vary among Class Members and which may be determined without reference to any Class Member's individual circumstances, include, but are not limited to:

a.    Whether Defendant failed to take adequate and reasonable measures to ensure its

website and data systems were protected;

    b.   Whether Defendant failed to take available steps to prevent and stop the breach from happening or mitigating the risk of a long-term breach;

    c.   Whether Defendant unreasonably delayed in notifying proposed Class Members of the harm they suffered once the suspicious activity was detected;

    d.   Whether Defendant owed a legal duty to Plaintiff and Class Members to protect their PI;

    e.   Whether Defendant breached any duty to protect the PI of Plaintiff and Class Members by failing to exercise due care in protecting their PI

    f.   Whether Defendant's conduct violated the statutes as set forth herein;

    g.   Whether Defendant took sufficient steps to secure Class Members' PI;

    h.   Whether Defendant was unjustly enriched;

    i.   Whether Plaintiff and Class Members are entitled to actual, statutory, or other forms of damages and other monetary relief; and

    j.   Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief or restitution

109.   **Typicality**. Plaintiff's claims are typical of other Class Members' claims because Plaintiff and Class Members were subjected to the same allegedly unlawful conduct and damaged in the same way.

110.   **Adequacy of Representation**. Plaintiff is an adequate class representative because he is a Class Member, and his interests do not conflict with the Class's interests. Plaintiff retained counsel who is competent and experienced in class action and data breach litigation. Plaintiff and his counsel intend to prosecute this action vigorously for the Class's benefit and will fairly and adequately protect their interests.

111.   **Predominance and Superiority**. The Class can be properly maintained because the above common questions of law and fact predominate over any questions affecting individual Class Members. A class action is also superior to other available methods for the fair and efficient

adjudication of this litigation because individual litigation of each Class Member's claim is impracticable. Even if each Class Member could afford individual litigation, the court system could not. It would be unduly burdensome if thousands of individual cases proceed. Individual litigation also presents the potential for inconsistent or contradictory judgments, the prospect of a race to the courthouse, and the risk of an inequitable allocation of recovery among those with equally meritorious claims. Individual litigation would increase the expense and delay to all parties and the courts because it requires individual resolution of common legal and factual questions. By contrast, the class-action device presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court.

112.    **Declaratory and Injunctive Relief**. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendant. Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class Members and impair their interests. Defendant has acted and/or refused to act on grounds generally applicable to the Class, making final injunctive relief or corresponding declaratory relief appropriate.

## VI.    CLASS ACTION ALLEGATIONS

### COUNT ONE
**Negligence**

**(On behalf of the Nationwide Class)**

113.    Plaintiff re-alleges and incorporates by reference all preceding allegations, as if fully set forth herein.

114.    Defendant requires its current and former students, as well as its student-applicants, including Plaintiff and Class Members, to submit non-public PI in the ordinary course of providing its services.

///

115.    Defendant gathered and stored the PI of Plaintiff and Class Members as part of its business of soliciting and providing educational services to students and student-applicants, which activities affect interstate commerce.

116.    Plaintiff and Class Members entrusted Defendant with their PI with the understanding that Defendant would safeguard their information.

117.    Defendant had full knowledge of the sensitivity of the PI and the types of harm that Plaintiff and Class Members could and would suffer if the PI were wrongfully disclosed.

118.    By voluntarily undertaking and assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' PI held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

119.    Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

120.    Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks adequately protected the PI.

121.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiff and Class Members. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential PI, a necessary part of being students and/or student-applicants at Defendant.

122.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is

bound by industry standards to protect confidential PI.

123.    Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiff or the Class.

124.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove former students' and student-applicants' PI it was no longer required to retain pursuant to regulations.

125.    Moreover, Defendant had a duty to promptly and adequately notify Plaintiff and the Class of the Data Breach.

126.    Defendant had and continues to have a duty to adequately disclose that the PI of Plaintiff and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PI by third parties.

127.    Defendant breached its duties, pursuant to the FTC Act and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class Members' PI. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

   a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PI;

   b.  Failing to adequately monitor the security of their networks and systems;

   c.  Allowing unauthorized access to Class Members' PI;

   d.  Failing to detect in a timely manner that Class Members' PI had been compromised;

   e.  Failing to remove former students' and student-applicants' PI it was no longer required to retain pursuant to regulations, and

   f.  Failing to timely and adequately notify Class Members about the Data

Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

128.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PI and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PI it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

129.    Plaintiff and Class Members were within the class of persons the Federal Trade Commission Act was intended to protect and the type of harm that resulted from the Data Breach was the type of harm that the statute was intended to guard against.

130.    Defendant's violation of Section 5 of the FTC Act constitutes negligence.

131.    The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

132.    A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

133.    It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' PI would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches targeting educational institutions.

134.    Defendant has full knowledge of the sensitivity of the PI and the types of harm that Plaintiff and the Class could and would suffer if the PI were wrongfully disclosed.

135.    Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the PI of Plaintiff and the Class, the critical importance of providing adequate security of that PI, and the necessity for encrypting PI stored on Defendant's systems or

transmitted through third party systems.

136.   It was therefore foreseeable that the failure to adequately safeguard Class Members' PI would result in one or more types of injuries to Class Members.

137.   Plaintiff and the Class had no ability to protect their PI that was in, and possibly remains in, Defendant's possession.

138.   Defendant was in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

139.   Defendant's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

140.   Defendant has admitted that the PI of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

141.   But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the PI of Plaintiff and the Class would not have been compromised.

142.   There is a close causal connection between Defendant's failure to implement security measures to protect the PI of Plaintiff and the Class and the harm, or risk of imminent harm suffered by Plaintiff and the Class. The PI of Plaintiff and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PI by adopting, implementing, and maintaining appropriate security measures.

143.   As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their PI; (iii) lost or diminished value of PI; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences

of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to their PI, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PI.

144.    Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their PI, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PI in its continued possession.

145.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

146.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT TWO
## BREACH OF IMPLIED CONTRACT
### (On behalf of the Class)

147.    Plaintiff re-alleges and incorporates by reference all preceding allegations, as if fully set forth herein.

148.    Plaintiff and Class Members were required to provide their PI to Defendant as part of the process of applying for initial enrollment or continuing enrollment at Defendant. Plaintiff and Class Members paid money—or had money paid on their behalf—to Defendant in connection with the application process. They would not have paid for Defendant's application services, or would have paid less, had they known that Defendant's data security practices were substandard.

149.    Defendant solicited, offered, and invited Class Members to provide their PI as part

of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offer and provided their PI in connection with applying for enrollment.

150.    Defendant accepted and retained possession of Plaintiff's and Class Members' PI for the purpose of providing enrollment-related services to them.

151.    Plaintiff and the Class entrusted their PI to Defendant. In so doing, Plaintiff and the Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

152.    In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations (including FTC guidelines on data security) and were consistent with industry standards.

153.    Implicit in the agreement between Plaintiff and Class Members and the Defendant to provide PI, was the latter's obligation to: (a) use such PI for business purposes only, (b) take reasonable steps to safeguard that PI, (c) prevent unauthorized disclosures of the PI, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PI, (e) reasonably safeguard and protect the PI of Plaintiff and Class Members from unauthorized disclosure or uses, (f) retain the PI only under conditions that kept such information secure and confidential.

154.    The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Defendant, on the other, is demonstrated by their conduct and course of dealing.

155.    On information and belief, at all relevant times Defendant promulgated, adopted, and implemented written privacy policies whereby it expressly promised Plaintiff and Class Members that it would only disclose PI under certain circumstances, none of which relate to the Data Breach.

156.    On information and belief, Defendant further promised to comply with industry standards and to make sure that Plaintiff's and Class Members' PI would remain protected.

157.   Plaintiff and Class Members paid money to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

158.   Plaintiff and Class Members would not have entrusted their PI to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

159.   Plaintiff and Class Members would not have entrusted their PI to Defendant in the absence of their implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

160.   Every contract in this State has an implied covenant of good faith and fair dealing, which is an independent duty and may be breached even when there is no breach of a contract's actual and/or express terms.

161.   Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

162.   Defendant breached the implied contracts it made with Plaintiff and the Class by failing to safeguard and protect their personal information, by failing to delete the information of Plaintiff and the Class once the relationship ended, and by failing to provide accurate notice to them that personal information was compromised as a result of the Data Breach.

163.   Defendant breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices to safeguard PI, failing to timely and accurately disclose the Data Breach to Plaintiff and Class Members and continued acceptance of PI and storage of other personal information after Defendant knew, or should have known, of the security vulnerabilities of the systems that were exploited in the Data Breach.

164.   As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiff and Class Members sustained damages, including, but not limited to: (i) invasion of privacy; (ii) theft of their PI; (iii) lost or diminished value of PI; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v)

loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to their PI, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PI.

165.    Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

166.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

167.    During Plaintiff's and Class Members' interactions with Defendant, Defendant was fully aware of the confidential nature of the PI that Plaintiff and Class Members provided to it.

168.    As alleged herein and above, Defendant's relationship with Plaintiff and Class Members was governed by promises and expectations that Plaintiff and Class Members' PI would be collected, stored, and protected in confidence, and would not be accessed by, acquired by, appropriated by, disclosed to, encumbered by, exfiltrated by, released to, stolen by, used by, and/or viewed by unauthorized third parties.

169.    Plaintiff and Class Members provided their respective PI to Defendant with the explicit and implicit understandings that Defendant would protect and not permit the PI to be accessed by, acquired by, appropriated by, disclosed to, encumbered by, exfiltrated by, released to, stolen by, used by, and/or viewed by unauthorized third parties.

170.    Plaintiff and Class Members also provided their PI to Defendant with the explicit and implicit understanding that Defendant would take precautions to protect their PI from unauthorized access, acquisition, appropriation, disclosure, encumbrance, exfiltration, release, theft, use, and/or viewing, such as following basic principles of protecting its networks and data

systems.

171.    Defendant voluntarily received, in confidence, Plaintiff's and Class Members' PI with the understanding that the PI would not be accessed by, acquired by, appropriated by, disclosed to, encumbered by, exfiltrated by, released to, stolen by, used by, and/or viewed by the public or any unauthorized third parties.

172.    Due to Defendant's failure to prevent, detect and avoid the Data Breach from occurring by, *inter alia*, not following best information security practices to secure Plaintiff's and Class Members' PI, Plaintiff's and Class Members' PI was accessed by, acquired by, appropriated by, disclosed to, encumbered by, exfiltrated by, released to, stolen by, used by, and/or viewed by unauthorized third parties beyond Plaintiff's and Class Members' confidence and without their express permission.

173.    As a direct and proximate cause of Defendant's actions and/or omissions, Plaintiff and Class Members have suffered damages, as alleged herein.

174.    But for Defendant's failure to maintain and protect Plaintiff's and Class Members' PI in violation of the parties' understanding of confidence, their PI would not have been accessed by, acquired by, appropriated by, disclosed to, encumbered by, exfiltrated by, released to, stolen by, used by, and/or viewed by unauthorized third parties. The Data Breach was the direct and legal cause of the misuse of Plaintiff's and Class Members' PI and the resulting damages.

175.    The injury and harm Plaintiff and Class Members suffered and will continue to suffer was the reasonably foreseeable result of Defendant's unauthorized misuse of Plaintiff's and Class Members' PI. Defendant knew its data systems and protocols for accepting and securing Plaintiff's and Class Members' PI had security and other vulnerabilities that placed Plaintiff's and Class Members' PI in jeopardy.

176.    As a direct and proximate result of Defendant's breaches of confidence, Plaintiff and Class Members have suffered and will continue to suffer injury, as alleged herein, including but not limited to: (i) actual identity theft, (ii) the compromise, publication, and/or theft of their PI, (iii) out-of-pocket expenses associated with the prevention, detection and recovery from

31

identity theft and/or unauthorized use of their PI, (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft, (v) the continued risk to their PI, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Class Members' PI in its continued possession, (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiff and Class Members, (vii) the diminished value of Plaintiff's and Class Members' PI, and (viii) the diminished value of Defendant's services for which Plaintiff and Class Members paid and received.

## COUNT THREE
## UNJUST ENRICHMENT

### (On behalf of the Nationwide Class)

177.    Plaintiff re-alleges and incorporates by reference all preceding allegations, as if fully set forth herein.

178.    Plaintiff brings this Count in the alternative to the breach of implied contract count above.

179.    Plaintiff and Class Members conferred monetary benefit on Defendant. Specifically, they paid Defendant and/or its agents for enrollment applications and, in so doing, also provided Defendant with their PI. In exchange, Plaintiff and Class Members should have received from Defendant the enrollment services that were the subject of the transaction and should have had their PI protected with adequate data security.

180.    Defendant knew that Plaintiff and Class Members conferred a benefit upon it and has accepted and retained that benefit by accepting and retaining the PI entrusted to it. Defendant profited from Plaintiff's retained data and used Plaintiff's and Class Members' PI for business purposes.

///

181.   Defendant failed to secure Plaintiff's and Class Members' PI and, therefore, did not fully compensate Plaintiff or Class Members for the value that their PI provided.

182.   Defendant acquired the PI through inequitable record retention as it failed to investigate and/or disclose the inadequate data security practices previously alleged.

183.   If Plaintiff and Class Members had known that Defendant would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their PI, they would have entrusted their PI at Defendant or applied for enrollment at Defendant.

184.   Plaintiff and Class Members have no adequate remedy at law.

185.   Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Personal Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profit at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their PI.

186.   Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

187.   As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their PI; (iii) lost or diminished value of PI; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to their PI, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate

measures to protect the PI.

188.    Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

189.    Plaintiff and Class Members may not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

### VII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and Class Members, requests judgment against Defendant and that the Court grants the following:

A.    For an Order certifying the Class, and appointing Plaintiff and his Counsel to represent the Class;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PI of Plaintiff and Class Members;

C.    For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii.    requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

   iii.   requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

   iv.   requiring Defendant to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PI for Plaintiff's and Class Members' respective lifetimes;

   v.   requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PI of Plaintiff and Class Members;

   vi.   prohibiting Defendant from maintaining the PI of Plaintiff and Class Members on a cloud-based database;

   vii.   requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

   viii.   requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

   ix.   requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

   x.   requiring Defendant to segment data by, among other things, creating firewalls and controls so that if one area of Defendant's network is compromised, hackers cannot gain access to portions of Defendant's

systems;

xi.    requiring Defendant to conduct regular database scanning and securing checks;

xii.    requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xiii.    requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiv.    requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xv.    requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xvi.    requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

     xvii.    requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

    xviii.    for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.    For an award of damages, including actual, nominal, consequential, and punitive damages, as allowed by law in an amount to be determined;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

## VIII.   DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all triable issues.

Dated: August 14, 2025

By: _____

M. Anderson Berry *
*aberry@justice4you.com*
Gregory Haroutunian
*gharoutunian@justice4you.com*
CLAYEO C. ARNOLD
A PROFESSIONAL CORPORATION
865 Howe Avenue
Sacramento, CA 95825
Telephone: (916) 239-4778
Fax: (916) 924-1829

** Pro hac vice forthcoming

*Attorneys for Plaintiff and the Putative Class*

37

# EXHIBIT 1

P.O. Box 3826
Suwanee, GA

502 1 150425 ·················"AUTO"·5-DIGIT 21046
KHAMARI NASHAUN BARR



SCAN TO ENROLL

August 7, 2025

### Notice of Security Incident

Dear Khamari:

As we previously disclosed, Columbia University recently experienced a cyber incident. We are writing to inform you of how it may impact you and your personal information, what measures we are taking and what steps you can take to protect yourself. We are providing you with information about the incident, our response, and additional measures you can take to help protect yourself.

### What Happened?

On June 24, 2025, we experienced a technical outage that disrupted certain of our IT systems. We promptly activated our response process, launched an investigation with the support of external cybersecurity experts, and reported the incident to law enforcement. Our investigation determined that, on or about May 16, 2025, an unauthorized third-party gained access to Columbia's network and subsequently took certain files from our system. To date, we have no evidence that any Columbia University Irving Medical Center patient records were affected.

### What Information Was Involved?

The affected data included your name, date of birth, and Social Security number, as well as any personal information that you provided in connection with your application to Columbia, or that we collected during your studies if you enrolled. This included your contact details, demographic information, academic history, financial aid-related information, and any insurance-related information and health information that you shared with us.

### What We Are Doing.

We have implemented a number of safeguards across our systems to enhance our security. Moving forward, we will be examining what additional steps we can take and additional safeguards we can implement to prevent something like this from happening again.

While we are not aware of identity theft or fraud related to this incident, we are offering you two years of complimentary credit monitoring and identity restoration services through Kroll. Details about this offer and instructions on how to activate these services are enclosed with this letter. Kroll is a global leader in risk mitigation and response, and their team has extensive experience helping people who have sustained an unintentional exposure of confidential data. Your identity monitoring services include Credit Monitoring, Fraud Consultation, and Identity Theft Restoration.

Visit **https://enroll.krollmonitoring.com** to activate and take advantage of your identity monitoring services.

*You have until November 30, 2025 to activate your identity monitoring services.*

Membership Number: **ETPJ44839-P**

For more information about Kroll and your Identity Monitoring services, you can visit info.krollmonitoring.com.

encourage you to enroll in the complimentary credit monitoring services that we are offering. Please review the enclosed *Steps You Can* ~~Take~~ *Information* to consider ~~steps~~ about the additional guidance on what you can do to safeguard against possible future misuse of your information.

## For More Information.

We have established a dedicated call center to answer questions about this incident. If you have any questions regarding this incident, please call (866) 819-7006, 9:00 a.m. to 6:30 p.m. Eastern Time, Monday through Friday, excluding major U.S. holidays.

Sincerely,

Columbia University

### Steps You Can Take to Help Protect Personal Information

**Monitor Your Accounts**

Under U.S. law, a consumer is entitled to one free credit report annually from each of the three major credit reporting bureaus: Equifax, Experian, and TransUnion. To order a free credit report, visit www.annualcreditreport.com or call 1-877-322-8228 toll-free. Consumers may also directly contact the three major credit reporting bureaus listed below to request a free copy of their credit report.

Consumers have the right to place an initial or extended "fraud alert" on a credit file at no cost. An initial fraud alert is a one-year alert that is placed on a consumer's credit file. Upon seeing a fraud alert display on a consumer's credit file, a business is required to take steps to verify the consumer's identity before extending new credit. If consumers are the victim of identity theft, they are entitled to an extended fraud alert, which is a fraud alert lasting seven years. Should consumers wish to place a fraud alert, please contact any of the three major credit reporting bureaus listed below.

As an alternative to a fraud alert, consumers have the right to place a "credit freeze" at no charge on a credit report, which will prohibit a credit bureau from releasing information in the credit report without the consumer's express authorization. The credit freeze is designed to prevent credit, loans, and services from being approved in a consumer's name without consent. However, consumers should be aware that using a credit freeze to take control over who gets access to the personal and financial information in their credit report may delay, interfere with, or prohibit the timely approval of any subsequent request or application they make regarding a new loan, credit, mortgage, or any other account involving the extension of credit. Pursuant to federal law, consumers cannot be charged to place or lift a credit freeze on their credit report. To request a credit freeze, individuals may need to provide some or all of the following information: (1) full name (including middle initial as well as Jr., Sr., II, III, etc.); (2) Social Security number; (3) date of birth; (4) addresses for the prior two to five years; (5) proof of current address, such as a current utility bill or telephone bill; (4) a legible photocopy of a government-issued identification card (state driver's license or ID card, etc.); and (6) a copy of either the police report, investigative report, or complaint to a law enforcement agency concerning identity theft if they are a victim of identity theft.

Should consumers wish to place a credit freeze or fraud alert, please contact the three major credit reporting bureaus listed below:

| Equifax | Experian | TransUnion |
|---|---|---|
| https://www.equifax.com/personal/credit-report-services | https://www.experian.com/help | https://www.transunion.com/credithelp |
| 1-888-298-0045 | 1-888-397-3742 | 1-800-916-8800 |
| Equifax Information Services LLC, P.O. Box 105069, Atlanta, GA 30348 | Experian Fraud Alert, P.O. Box 9554, Allen, TX 75013 | TransUnion Fraud Alert, P.O. Box 2000, Chester, PA 19016 |
| Equifax Credit Freeze, P.O. Box 105788, Atlanta, GA 30348 | Experian Credit Freeze, P.O. Box 9554, Allen, TX 75013 | TransUnion Credit Freeze, P.O. Box 160, Woodlyn, PA 19094 |

**Additional Information**

Consumers may further educate themselves regarding identity theft, fraud alerts, credit freezes, and the steps you can take to protect your personal information by contacting the three major credit reporting bureaus, the Federal Trade Commission, or your state attorney general. The Federal Trade Commission may be reached at: 600 Pennsylvania Avenue NW, Washington, D.C. 20580; www.identitytheft.gov; 1-877-ID-THEFT (1-877-438-4338); and TTY: 1-866-653-4261. The Federal Trade Commission also encourages those who discover that their information has been misused to file a complaint with them. Consumers can obtain further information on how to file such a complaint by way of the contact information listed above. Consumers have the right to file a police report if they ever experience identity theft or fraud. Please note that in order to file a report with law enforcement for identity theft, consumers will likely need to provide some proof that they have been a victim. Instances of known or suspected identity theft should also be reported to law enforcement and the relevant state attorney general. This notice has not been delayed by law enforcement.

*For District of Columbia residents*, the District of Columbia Attorney General may be contacted at: 400 6th Street, NW,

to ask for their credit score, and the right to dispute incomplete or inaccurate information. Further, pursuant to the Fair Credit Reporting Act, the consumer reporting bureaus must correct or delete inaccurate, incomplete, or unverifiable information; consumer reporting agencies may not report outdated negative information; access to consumers' files is limited; consumers must give consent for credit reports to be provided to employers; consumers may limit "prescreened" offers of credit and insurance based on information in their credit report; and consumers may seek damages from violators. Consumers may have additional rights under the Fair Credit Reporting Act not summarized here. Identity theft victims and active-duty military personnel have specific additional rights pursuant to the Fair Credit Reporting Act. We encourage consumers to review their rights pursuant to the Fair Credit Reporting Act by visiting www.consumerfinance. gov/f/201504_cfpb_summary_your-rights-under-fcra.pdf, or by writing Consumer Response Center, Room 130-A, Federal Trade Commission, 600 Pennsylvania Ave. N.W., Washington, D.C. 20580.

*For New York residents,* the New York Attorney General may be contacted at: Office of the Attorney General, The Capitol, Albany, NY 12224-0341; 1-800-771-7755; and https://ag.ny.gov. The New York Department of State Division of Consumer Protection may be contacted at: http://www.dos.ny.gov/consumerprotection or (800) 697-1220.

*For North Carolina residents,* the North Carolina Attorney General may be contacted at: 9001 Mail Service Center, Raleigh, NC 27699-9001; 1-877-566-7226 or 1-919-716-6000; and www.ncdoj.gov.

*For Oregon residents,* you are advised to report any suspected identity theft to law enforcement, including the Federal Trade Commission and the Oregon Attorney General.

*For Rhode Island residents,* the Rhode Island Attorney General may be reached at: 150 South Main Street, Providence, RI 02903; www.riag.ri.gov; and 1-401-274-4400. Under Rhode Island law, individuals have the right to obtain any police report filed in regard to this event. There are approximately 2,510 Rhode Island residents that may be impacted by this event.